IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOHN WILKS, *et al.*,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| vs. | * | Civil Action: 08-00638-CG-B |
| | * | |
| **MARK C. CALLAHAN, d/b/a** | * | |
| **Callahan Financial** | * | |
| **Services, *et. al.*,** | * | |
| | * | |
| **Defendants.** | * | |

## REPORT AND RECOMMENDATION

This matter, which was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), is before the Court on Plaintiffs' Motion to Remand. (Doc. 18). Upon review of the referenced motion, supporting briefs and materials, and Defendants' briefs in opposition, the undersigned **recommends** that Plaintiffs' Motion to Remand be **GRANTED.**

### I. Procedural History

Plaintiffs John Wilks and Michael Wilks filed on September 26, 2008, a Complaint in the Circuit Court of Mobile County, Alabama, against Mark C. Callahan, d/b/a Callahan Financial Solutions ("Callahan"); Lalat Pattanaik, d/b/a I.P.S. Private Advisors ("Pattanaik"); Brady Richardson d/b/a Richardson Consultants ("Richardson"); J. Michael Mangawang ("Mangawang"); Frederick A. Romero ("Romero"); and American General Life Insurance Co. ("AIG"). On October 30, 2008, Defendant AIG filed a Notice of Removal (Doc.

1) pursuant to 28 U.S.C. § 1331, contending that Plaintiffs' claims invoke federal question jurisdiction under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et. seq.* On November 6, 2008, AIG filed a Motion to Dismiss Plaintiffs' complaint. (Doc. 10).  Shortly thereafter, Plaintiffs filed the instant  Motion to Remand this case to the Circuit Court of Mobile County, Alabama.  (Doc. 18).

## II.  Background Facts

Plaintiffs John Wilks and Michael Wilks,("Plaintiffs") are shareholders of J&M Associates, Inc. ("J&M").  Viewing the facts in the light most favorable to Plaintiffs, in March 2004, Plaintiffs were approached by Mark Callahan, an insurance agent for AIG, regarding a welfare benefit plan known as the California Building Supply Wholesalers and Contractors League's Voluntary Employees Beneficiary Association Plan ("VEBA" or "Plan"). (Doc. 1, Ex. A, para. 7) Callahan asserted that the plan would provide Plaintiffs and J&M with certain tax benefits and that it was approved by the IRS. (Id. ) Callahan explained that one of the ten plan members was no longer participating, and that as a result, there was an opening for a tenth member of the plan. (Doc. 1, Ex. A, para. 8)  Callahan further explained that in order to reserve a membership in the Plan, the beneficiaries of the Plan, in this case, the Wilks, would have to submit applications for life insurance and that J&M would have to apply for membership, and adopt the Plan immediately. (Id.)

In reliance on Callahan's representations, Plaintiffs, as beneficiaries of the Plan, submitted life insurance applications in March 2004. (Doc. 1, Ex. A, para. 9). J&M's Board of Directors, on April 1, 2004, adopted the VEBA plan, and on April 5, 2004, J&M submitted an Application for Membership and signed the Adoption Agreement.  The Adoption Agreement included a provision that irrevocably appointed Defendants Callahan and Richardson as two members of a master committee with exclusive authority to deal with matters pertaining to J&M's participation in the VEBA Plan.  On April 26, 2004, the beneficiaries underwent medical examinations. (Doc. 1, Ex. A, para. 9, 13).

On May 18, 2004, Callahan, Pattanaik and Richardson, acting as agents for AIG, made a presentation to J&M and the Wilks regarding the VEBA Plan.  (Doc. 1, Ex. A, para. 10).  Callahan, Pattanaik and Richardson represented that the Plan offered certain tax benefits, that the Plan had been approved by the IRS, and that the Plan included "a hardship rider that provided flexibility in the amount of premiums paid when invoked, and that the Plan allowed participants to restructure payments by suspending or reducing them in the event of an economic hardship until such time as J & M could continue participation, or terminate the Plan with benefits distributed to the participating employees. (Doc. 1, Ex. A, para. 12). During the presentation, J&M and the Plaintiffs were provided with a letter dated March 4, 2004 that Defendant Romero addressed

to the Administrative Service Provider of the VEBA Plan. In the letter, Romero opined that the VEBA Plan was not a tax-avoidance transaction and was not required to be disclosed as a Reportable and Listed Transaction to the IRS. (Doc. 1, Ex. A, para. 15).

In May 2004, J&M retained Defendant Romero, based on the recommendation of Callahan, Pattanaik and Richardson, to provide a legal opinion regarding the various benefits provided by the Plan. (Doc. 1, Ex. A, para. 14). Romero issued a written legal opinion in August 2004, in which he represented that the Plan "had been established and operated for years," and had IRS approval. (Doc. 1, Ex. A, para. 15).

Defendants Callahan, Pattanaik and Richardson made yet another presentation to J&M and the Wilks in June 2004. During this presentation, they again repeated their representations, promises and assurances regarding the VEBA Plan. (Doc. 1, Ex. A, para. 14). In reliance on Defendants' representations, J&M paid an initial $400,000 deposit in June of 2004 for participation in the Plan, and requested the committee to purchase life insurance products suitable for the goals of J & M and the Plaintiffs as beneficiaries. (Doc. 1, Ex. A, para. 14) J&M paid an additional deposit in the amount of $300,000 in August 2004, and a third deposit in the amount of $300,000 in December 2004. (Doc. 1, Ex. A, para. 15) Defendant Pattanaik delivered insurance policies to John Wilks and Mike Wilks on September 8, 2004, following the second

payment. Bill Wilks' policy was delivered at a later date. (Doc. 1, Ex. A, para. 15)

In August 2005, J & M suffered immense damage as a result of Hurricane Katrina, and informed Defendants Callahan and Pattanaik that due to the substantial economic hardship resulting from Hurricane Katrina, J &M would be unable to continue to make the $1 million per year contributions under the VEBA plan. (Doc. 1, Ex. A, para. 16).  J &M and the Plaintiffs repeatedly inquired about and requested restructuring the program with AIG to reduce or suspend payments and notified Callahan and Pattanaik of their intent to utilize the hardship clause. (<u>Id.</u>).  In September/October 2005, Callahan and Pattanik met with J&M and the Plaintiffs regarding their request to restructure the program and invoke the hardship rider.  Defendant Pattanik represented that the program could be restructured, that the hardship rider was available, and that a payment of $110,000 would be acceptable until the policy could be restructured.  Callahan and Pattanik also assured J & M and the Plaintiffs that the $1,000,000 contribution made in 2004 was secure. Based upon these representations, J &M made a $110,000 payment to the VEBA Plan in October 2005, and a $150,000 payment in December 2005. (Doc. 1, Ex. A, para. 17)

In February 2006, Callahan advised J &M and Plaintiffs that a contribution in the amount of $180,000 had to be made immediately or J & M would suffer serious tax consequences.  Callahan did not

provide any explanation, and neither Callahan nor Pattanaik thereafter responded to J & M and the Wilks' repeated requests to restructure the program and invoke the hardship rider. (Doc. 1, Ex. A, para. 19).

According to Plaintiffs, J&M did not report the contributions or plan participation to the IRS, and on July 30, 2008 the IRS issued a notice to J&M that the payments for the AIG policies of insurance are not deductible as ordinary and necessary business expenses, and that all related expenses are disallowed, assessing a $400,000 penalty for failing to disclose a listed transaction. The IRS further determined that the Wilks owed over $500,000 in taxes and penalties, and assessed $200,000 in additional penalties against each for failure to disclose a listed transaction.  (Doc. 1, Ex. A, para. 27).

**III. Motion to Remand**

**A.   Legal Standard**

This court's analysis begins with the threshold jurisdictional question raised by Plaintiffs' Motion to Remand.  Absent federal jurisdiction, this Court lacks the power to decide Defendants' pending Motion to Dismiss, and must immediately remand this action to state court without reaching the question of whether Plaintiffs have stated cognizable claims against Defendants. See, <u>Morrison v. Allstate Indemnity Co.</u>, 228 F.3d 1255, 1261 (11th Cir. 2000) (When subject matter jurisdiction is deemed lacking, "the court's sole

remaining act is to dismiss the case for lack of jurisdiction"); University of South Alabama v. American Tobacco Co., 168 F.3d 405, 411 (11th Cir. 1999)("the district court should have resolved the issue of subject matter jurisdiction before reaching the merits of any other issue" because to reach merits of pending motion in removed case where jurisdiction may be lacking would deprive state court of its right to resolve controversies in its own courts). Thus, the Court must first determine whether this action was properly removed from state court.

A removing defendant must establish the propriety of removal under 28 U.S.C. § 1441 and must establish the existence of federal jurisdiction. Leonard v. Enterprise Rent a Car, 279 F.3d 967, 972 (11th Cir. 2002)("A removing defendant bears the burden of proving proper federal jurisdiction."). Because removal infringes upon state sovereignty and implicates central concepts of federalism, removal statutes must be construed narrowly, with all doubts resolved in favor of remand. See University of South Alabama, 168 F.3d at 411 (explaining that strict construction of removal statutes derives from "significant federalism concerns" raised by removal jurisdiction); Whitt v. Sherman Int'l Corp., 147 F.3d 1325, 1333 (11th Cir. 1998)(expressing preference for remand where removal jurisdiction is not absolutely clear); Burns v. Windsor Ins. Co., 31 F.3d 1092, 1095 (11th. Cir. 1994)(uncertainties regarding removal are resolved in favor of remand); Newman v. Spectrum Stores, Inc.,

109 F.Supp.2d 1342, 1345(M.D. Ala. 2000)("Because federal court jurisdiction is limited, the Eleventh Circuit favors remand of removed cases where federal jurisdiction is not absolutely clear.").

**B.  Analysis**

Plaintiffs' Motion to Remand is premised on an Order entered by Chief Judge Callie Granade in a related case, J&M Associates, Inc. V. Callahan, *et. al.*, Case No. 1:07-cv-883-CG-C ("J&M Associates case").  In that case, J&M has asserted on behalf of the corporation, near identical claims involving the same set of facts, against the same Defendants in the instant case.  In the J&M Associates case, Chief Judge Granade, in ruling on a motion to dismiss filed by Defendant AIG, held that none of J&M's claims against AIG were completely exempted. In reaching this conclusion, Chief Judge Granade observed as follows:

> J&M focuses on arguing that this case is not completely preempted because the defendant at issue, American General, is not an ERISA entity in the proper sense.  The court agrees.
>
> ERISA entities are the employer, the plan the plan fiduciaries, and the beneficiaries under the plan." Morstein v. National Ins. Servs., 93 F.3d 715, 722 (11th Cir. 1996)(en banc). American General is not the employer, the plan, or the beneficiary, so it must be a plan fiduciary in order for it to be "an ERISA entity" for purposes of complete preemption.  In Cotton, the Eleventh Circuit explained that, even if a defendant is an ERISA entity for some purposes, it is not an ERISA entity for purposes of the Butero test if it did not act in a fiduciary capacity for "any purpose related to the misconduct" alleged in the complaint.  Cotton, 402 F.3d

8

at 1270. . . .

[In Cotton,] [t]he court held that plaintiff did not allege facts to establish that the defendant was "a fiduciary for the purposes of this case," and reversed the default. Id. at 1277. The court specifically held that "urging the purchase of its products does not make an insurance company an ERISA fiduciary with respect to those products," and concluded that the complaint's allegations did not establish that the insurer defendant did anything more than that. Id. at 1278-80.

The Eleventh Circuit continued its analysis, considering whether there was federal subject matter jurisdiction over the case under the complete preemption doctrine. It held that there was no complete preemption, rendering "federal question jurisdiction . . . lacking," because the defendant insurer "was not wearing its fiduciary hat when it allegedly misled the plaintiffs regarding future benefits under their policies." Id. at 1280. . . .

The allegations in the Complaint support J&M's argument that each of its state-law claims could survive based only on activities that American General undertook outside of its role as a fiduciary and that J&M is not seeking to recover plan benefits.

(Doc. 18 at 6-11).

In the instant action, Plaintiffs argue that the reasoning applied by the Court in the J&M Associates case logically applies to the facts of this case. Thus, this case should be remanded because diversity jurisdiction is lacking. (Doc. 18 at 2-3). According to Plaintiffs, AIG is not a party to the Plan, nor is it a fiduciary to the Plan. Plaintiffs further argue that the hardship rider promised by Defendants is not a benefit included in the Plan, and there is no evidence that discretionary authority to invoke or not invoke the hardship rider is a fiduciary duty under the Plan. With respect to Defendants Callahan and Richardson,

9

Plaintiffs acknowledge that they are named fiduciaries under the Plan, because they are members of the Plan committee; however, Plaintiffs contend that their claims against Callahan and Richardson do not entail any activities undertaken by them in their capacity as members of the Plan committee. Finally, Plaintiffs assert that they are not seeking to recover any benefits under the Plan, nor or they seeking to invoke the hardship rider. Plaintiffs assert that they are instead seeking damages for the IRS assessed penalties and fines against them for participating as beneficiaries in a Listed Transaction, and damages for the taxes owed as a result of having participated in an illegal transaction.

In response to Plaintiffs' motion, AIG first argues that contrary to Judge Granade's finding in the J&M Associates case, AIG is a fiduciary because it is vested with discretion to determine the presence or absence of a "substantial business hardship" for purposes of the hardship rider, which is at the very heart of Plaintiffs' Complaint. Defendants also argue that Plaintiffs' claims, reduced to their essence, amount to a request to take advantage of the hardship rider, which is a benefit under the Plan. Thus, Plaintiffs are really seeking to recover benefits under the Plan, and as a result, their claims are preempted by ERISA.

AIG further argues that Judge Granade's finding in the J&M Associates case is not dispositive of the issue before this Court because Judge Granade's finding was limited to AIG, as opposed to

the individual Defendants.  AIG asserts that Callahan and Richardson are named fiduciaries under the Plan, and are vested with broad control over the administration and operation of the Plan.  According to AIG, assuming arguendo the truth of Plaintiffs' assertions that after being named to the Plan committee, Callahan and Richardson misrepresented the security of Plaintiffs' investment, the tax benefits/advantages of Plan participants and J&M's ability to restructure the Plan and or invoke the Plan's hardship ride, Callahan and Richardson were clearly acting in a fiduciary capacity at that juncture; thus, Plaintiffs' claims against them are preempted as they fall within the scope of ERISA §§ 502(a)(3), which provides a potential avenue of relief for losses to plan participants caused by an alleged breach of fiduciary duty[1].

As observed by Chief Judge Granade in the J&M Associates case, Butero[2] establishes the test for ERISA complete preemption.  Under the test, ERISA preemption exists only when the plaintiff is

---

[1] Defendant Callahan adopted and incorporated by reference AIG's Response to Plaintiffs' Motion to Remand. (Doc. 22). Defendant Pattanaik likewise adopted AIG's Response.  Pattanaik also argues that Plaintiffs' claims against him are preempted to the extent Plaintiffs' complaints against AIG are preempted because he is an agent of AIG.  Additionally, he argues that he is a Plan fiduciary like Callahan and Richardson due to his power and control over the management of VEBA.  (Doc. 23).

[2] Butero v. Royal Maccabees Life Ins. Co., 174 F.3d 1207 (11th Cir. 1999).

seeking relief that is available under 29 U.S.C. § 1132(a). Relief is available, and there is complete exemption, when four elements are satisfied.  First, there must be a relevant ERISA plan. Second, the plaintiff must have standing to sue under the plan. Third, the defendant must be an ERISA entity. Finally, the complaint must seek compensatory relief akin to that available under § 1132(a); often, this will be a claim for benefits due under a plan. 174 F. 3d at 1212.   In the instant action, the parties dispute whether the third and fourth parts of the Butero test have been satisfied.  With respect to the third factor, Defendants argue that they are ERISA fiduciaries because AIG has authority under the plan to determine whether the hardship rider can be invoked and Callahan and Richardson were members of the Plan committee and as such, were vested with the authority and discretion to administer the Plan.

>   Under ERISA, a fiduciary is defined as follows:
>
>   [A] person is a fiduciary with respect
> to a  plan to the extent (i) he exercises
> any discretionary authority or
> discretionary control respecting management
> of such plan or exercises any  authority or
> control respecting management or disposition
> of its assets, (ii) he renders investment
> advice for a fee or other compensation,
> direct or indirect, with respect to any moneys
> or other property of such plan, or has
> any authority or responsibility  to do so, (iii)
> he has any discretionary authority or
> discretionary responsibility in administration
> of such plan.

 29 U.S.C. § 1002(21)(A).

The case law makes clear however that this is a functional rather than a categorical definition. In other words, a person may be a fiduciary in relation to certain claims but not to other claims. Westfall v. Bevan, 2009 U.S. Dist. LEXIS 4404 (N.D. Texas, January 15, 2009). Thus, the key question comes down to whether the defendant was acting its role as a fiduciary entity when the alleged misconduct occurred. *See* Cotton v. Massachusetts Mutual Life Ins. Co., 402 F. 3d 1267, 1287 (llth Cir. 2005). In Cotton, the plaintiffs alleged that the insurance company induced them to purchase its policies through fraud and misrepresentation. 402 F. 3d at 1273. The plaintiffs also asserted that the alleged misrepresentations were made both before and after the plan was established. Id. at 1287. The Court held:

> We agree that Mass Mutual is not a fiduciary for any purpose other than making benefit determinations, a function that is not at issue in this lawsuit. Thus, it was not acting "in its role as an ERISA entity" at the time the plaintiffs allege that it fraudulently induced them to buy the vanishing premium life insurance policies at issue here. As such, this lawsuit does not seem to "affect[] . . . relations among principal ERISA entities as such" but instead affects only the relationship between two policyholders and their insurer. . . .
>
> [T]he fact that the misconduct is alleged to have begun at a time when the defendant could not possibly have been acting as an ERISA fiduciary at least suggests that the suit may not lawsuit may not be against the insurer-qua-fiduciary.

Id. at 1287.

In the case at hand, Defendants assert that under the Plan, AIG had authority to make determinations about the hardship rider, and that Callahan and Richardson, as members of the Plan committee, had both the authority and discretion to administer the Plan. Notwithstanding Defendants' assertions, the crux of Plaintiffs' claims in this action do not relate to administration of the Plan or Plaintiffs' right to invoke the hardship rider, or entitlement to benefits under the Plan.  Instead, the crux of Plaintiffs claims is that Defendants made various misrepresentations to induce Plaintiffs to contract with Defendants, failed to perform as they represented, and engaged in misconduct in furtherance of their initial fraud once Plaintiffs joined the Plan.  Thus, it is clear that the misconduct at which Plaintiffs' claims are directed is not misconduct that occurred while Defendants were acting as ERISA fiduciaries.  In other words, Defendants were not acting as ERISA fiduciaries when they allegedly made false misrepresentations to induce Plaintiffs to join the Plan and then took steps after Plaintiffs joined the Plan to perpetuate the initial fraud. Moreover, as noted in the Cotton case, the fact that the alleged initial misrepresentations were made before any Defendant had fiduciary status further suggests that this suit is not brought against Defendants in their fiduciary capacities under ERISA.

Assuming arguendo that Defendants were able to establish that Plaintiffs' claims against them arose in their roles as ERISA

fiduciaries, there would still be no ERISA preemption because the fourth Butero factor is not satisfied. In Cotton, the Court observed that the plaintiffs' suit was not a challenge to "a refusal to pay benefits" under an ERISA Plan. Id. at 1287. According to the Court, the "[b]enefits have not yet become due under the policy, and from the plaintiffs' perspective, the problem is that the terms of the policy themselves do not match Mass Mutual's earlier representations". Id. at 1287.

Similarly, in Tidwell v. Coldwaters Covers, Inc., 393 F. Supp. 2d 1257 (N.D. Ala. 2005), the court held that the plaintiff's lawsuit, which involved allegations that the employer failed to fulfill its promise to invest a certain amount of the plaintiff's pay in the employer's common stock was not preempted because the employee was not suing to recover benefits under an ERISA plan. The Court observed as follows:

> "Tidwell is not suing" to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Rather Tidwell is suing to recover money due him under an alleged promise to use $3.75/hour of his wages to purchase stock in Coldwater Covers. What Coldwater Covers actually did with the money is related to Coldwaters' defense that it did not misrepresent to Tidwell how it would use the money and that Tidwell authorized it to put the money in the ERISA plan. If Tidwell were to recover on the basis of the claims in his complaint, he would not recover under the terms of the plan; rather, he would recover money taken and applied to an unauthorized purpose --

> in this case, an ERISA plan.  Thus, Tidwell is not seeking relief available under ERISA, his claims are not completely preempted, and the court has no jurisdiction to hear the case."

Id. at 1262-63.

In the case at hand, a reading of Plaintiffs' claims, as a whole, demonstrates that Plaintiffs are not seeking to recover benefits under the Plan, to invoke the hardship ride, or to have their future rights clarified under the Plan.  Plaintiffs are instead seeking to be compensated for the injuries they sustained as a result of their reliance on Defendants' misrepresentations, including various tax liabilities, penalties and fines.  If Plaintiffs were to recover on the basis of their claims, they would not recover under the terms of the Plan, but would be instead be compensated for the IRS penalties and fines levied against them for participating as beneficiaries in a Listed Transaction, and for the taxes owed as a result of having participated in an illegal transaction.

## IV.  Conclusion

Construing the removal statue strictly and resolving all doubts in favor of remand, in accordance with University of South Alabama, 168 F.3d at 411, the court finds that Defendants have failed to establish the propriety of removal under 28 U.S.C. § 1441, and have failed to establish the existence of federal jurisdiction.  Accordingly, the undersigned **RECOMMENDS** that the

Motion to Remand this case to the Circuit Court of Mobile County, Alabama is due to be **GRANTED**.

The attached sheet contains important information regarding objections to the report and recommendation of the Magistrate Judge.

DONE this **3rd day of June, 2009.**

                    **/s/ SONJA F. BIVINS**
                **UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.   **Objection**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)©; Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **Opposing party's response to the objection.**  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.

18

Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   **<u>Transcript (applicable where proceedings tape recorded)</u>**. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

                <u>     **/s/ SONJA F. BIVINS**     </u>
                **UNITED STATES MAGISTRATE JUDGE**